# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| VOLTAGE PICTURES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. CV413-037 |
| DOES 1-31 | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

This copyright infringement case is "one of hundreds if not thousands of lawsuits involving the use of BitTorrent technology which have been filed throughout the nation." *Malibu Media, LLC v. Doe*, ___ F. Supp. 2d ___, 2013 WL 525352 at * 1 (M.D. Fla. Feb. 13, 2013). Voltage Pictures, LLC seeks injunctive relief plus damages against the defendants, unidentified infringers of Voltage's film, *Maximum Conviction*. Doc. 1 at 16. Sued as "Does," Voltage alleges that they are using a process known as "BitTorrent downloading" to violate its copyright. *Id.* Having identified the Internet Protocol (IP) addresses of the John Doe defendants, it moves for expedited discovery to learn the

Does' names while keeping them joined in this lawsuit.[1] Doc. 4. Because of diverging case law illuminating a misjoinder issue specific to BitTorrent lawsuits (whether copyright owners like Voltage meet Rule 20's requirements when they sue multiple downloader-infringers in one lawsuit), the Court directed further briefing, doc. 7, *reported at* 2013 WL 1339724, and Voltage has complied. Doc. 8.

## I. BACKGROUND

Comprehension here is assisted by briefly reviewing some computer hardware and software concepts. An IP address is a numerical label assigned to each device (though a device may have more than one IP address) on a network that uses the Internet Protocol for communication. Andrew Shapiro, *Why Do Unique IP Addresses Matter and What is Their Importance?*, Business2Community, Apr. 24, 2013, http://www.business2community.com/tech-gadgets/why-do-unique-ip-addresses-matter-and-what-is-their-importance-0474610. An Internet Service Provider (ISP) generally assigns a single, public IP address to

---

[1] Under Fed. R. Civ. P. 20, a plaintiff may join claims against defendants if the claims arise out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all these persons will arise in the action. Fed. R. Civ. P. 20(a)(1)(A)-(B). Fed. R. Civ. P. 21, in turn, permits a court -- on motion or on its own -- to "add or drop a party" and "also sever any claim against a party." Fed. R. Civ. P. 21.

every subscriber. F. Audet & Cullen Jennings, *Network Address Translation (NAT) Behavioral Requirements for Unicast UDP*, (Jan. 2007), https://tools.ietf.org/html/rfc4787. The subscribers connect to the ISP with a modem. The subscriber can then share the modem's internet access across his home network with a device called a router.[2] *Id.* That allows multiple devices on a network to share the single public, ISP-assigned IP address. *Id.*

Once on the internet, computer users can share files between each other. BitTorrent, a peer-to-peer (P2P) file sharing protocol, is one of the most popular ways internet subscribers transfer data from one device (a peer) to another (peer). *Malibu Media LLC v. Reynolds*, 2013 WL 870618 at *1 (N.D. Ill. Mar. 7, 2013). Before BitTorrent came along,

> users seeking to download data through [P2P] file sharing networks relied on the single-source technique, which required a user to form a one-to-one connection with a host computer for the purpose of downloading a file from that host. While the single-source method may have been adequate for transferring relatively

---

[2] Under the widely adopted version four of the internet protocol (things differ a bit with the emerging adoption of V6), the router (or in some instances, the modem itself) "translates" private, internal IP addresses (computers, etc.) into the single, shared ISP-assigned IP address. F. Audet, *supra*. As the public IP address is shared among many devices and users, any one of a home's users can do things on the internet that others on that network may not know about. And nearby neighbors (whether permitted or unauthorized) may also "surf" using a homeowner's wireless network.

small amounts of data, it proved cumbersome for users seeking to transfer larger data files. This is because the single source method requires one host computer and network to shoulder the entire burden of uploading a file to a particular user. The BitTorrent protocol overcomes this limitation by allowing users [hence, a group of peers] to join a "swarm" of host computers to download and upload fractions, or "pieces," of large files from each other simultaneously, resulting in a reduced load on any one computer. While use of the BitTorrent protocol itself is not illegal, many of its users use it to unlawfully download and distribute copyrighted works.

*Id.* Operationally,

[t]he BitTorrent protocol involves three parties: the server of the torrent file, the tracker,[3] and the client.[4] The torrent file contains meta-data information of the file to be downloaded, which includes the tracker's URL, the file's name and length, and the SHA-1 hash values of individual file chunks.[5] A tracker maintains a list of all the clients that are currently downloading a certain file (leechers) or have the complete file and only upload it to others (seeders). The tracker, the leechers, and the seeders constitute a BitTorrent

---

[3] "A BitTorrent tracker is a server that assists in the communication between peers using the BitTorrent protocol. It is also, in the absence of extensions to the original protocol, the only major critical point, as clients are required to communicate with the tracker to initiate downloads. Clients that have already begun downloading also communicate with the tracker periodically to negotiate with newer peers and provide statistics; however, after the initial reception of peer data, peer communication can continue without a tracker" using peer exchange and distributed hash tables, (discussed in note 12, *infra*). BitTorrent Tracker, Wikipedia, http://en.wikipedia.org/wiki/BitTorrent_tracker.

[4] "A 'Client Program,' [is] a software program that serves as the user's interface during the process of uploading and downloading data." *Malibu Media LLC* 2013 WL 870618 at *2.

[5] The SHA-1 hash code is used to verify the integrity of received data. BitTorrent, Wikipedia, https://en.wikipedia.org/wiki/BitTorrent#Creating_and_publishing_torrents.

swarm (also referred to as torrent). To download a file, a client: 1) obtains the corresponding torrent file; 2) contacts the tracker to obtain a *partial* swarm view, which usually consists of up to 50 peers;[6] 3) connects to the peers in the partial view; and 4) downloads file chunks from the seeders and/or exchanges file chunks with the leechers.

Michael Sirivianos, et al., *Free-Riding in BitTorrent Networks with the Large View Exploit*, Technical Report UCI-ICS 07-01 at 2 (2007), http://www.iptps.org/papers-2007/SirivianosParkChenYang.pdf (footnotes and emphasis added). Reducing the file-transmission burden by breaking files into smaller pieces spread among peers is the protocol's central feature. *Reynolds*, 2013 WL 870618 at *2.

The protocol was initially designed to force a "rate-based tit-for-tat incentive mechanism to motivate users to upload." Michael Sirivianos, *Free-Riding*, at 1. Users, however, quickly circumvented this requirement, giving rise to a "free rider" problem -- they thus would download things like movies without also uploading in service of "the" swarm. *Id.* Regardless,

---

[6] "Although a particular BitTorrent swarm may, over its lifetime, consist of thousands of peers, at any given moment each peer is only directly sharing with *a small fraction* of the swarm." *Third Degree Films, Inc. v. John Does 1-72*, 2013 WL 1164024 at * 2 (E.D. Mich. Mar. 18, 2013) (emphasis added). In other words, peers organize into sub-swarms rather than simultaneously joining every other peer known to the tracker.

[o]nce a peer user has received every piece of the file, the BitTorrent Client Program rearranges the various pieces into their correct order, resulting in a file identical to the initial seed. This file becomes an additional seed within the same swarm, and remains available to other peers *as long as* the user that is in possession of the file remains connected to the swarm through the Client Program.[7] The presence of the additional seed file [often] increases the speed, efficiency, and reliability of downloading activity for future peers entering the swarm. *See Digital Sin, Inc. v. Does 1–27*, No. 12 Civ. 3873(JMF), 2012 WL 203 6035, at *1 (S.D.N.Y. June 6, 2012). Therefore, users derive a benefit from the interconnected architecture of the BitTorrent protocol even though they *generally do not communicate with one another* and will not have information about other users in their swarm other than their IP addresses. However, if a peer *leaves* the swarm after obtaining the seed file by closing the Client Program, changing the Client Program's settings to turn off automatic uploading, disconnecting from the Internet, or turning off his computer, *peers who subsequently enter the swarm do not benefit from the earlier peer's activity.*

*Reynolds*, 2013 WL 870618 at * 3 (emphasis added). These operational details demonstrate that participation may actually be more transient than it otherwise may seem, a point underscored in cases requiring that more than a simple swarm cluster be alleged. *See Third Degree*, 2013 WL 1164024 at * 5.

Because BitTorrent allows users to share files anonymously,

---

[7] Hence, the participant is part of the process so long as he leaves his copy of the file available for seeding. Yet, he can keep the Client Program open and still pull out of the swarm.

copyright owners like Voltage at most can find out a user's public IP address. *See, e.g., id.* at * 3 (describing an investigative service's use of forensic software "to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the internet to reproduce, distribute, display or perform the [copyrighted film].") (quotes and cite omitted). But to determine their identities, owners resort to subpoenaing ISP providers who have those identities on file with each IP address. *That* is what Voltage seeks here -- via early discovery -- and what owners have been seeking in a multitude of other BitTorrent cases nationwide. And, as noted *supra*, Voltage wants to join all of those defendants in this lawsuit.

## II. ANALYSIS

Voltage must satisfy Fed. R. Civ. P. 20(a)(2)'s permissive joinder standard -- the subject of the Court's prior, Rule 20(b) ("Protective Measures") order directing further briefing.[8] Before turning to Voltage's

---

[8] It must also meet the standard for obtaining pre-answer discovery. Discovery typically does not commence until the parties have met and conferred under Federal Rule of Civil Procedure 26(f). But for good cause courts can authorize early, pre-answer discovery "for the parties' and witnesses' convenience and in the interests of justice." Fed. R. Civ. P. 26(d)(2); *see also Quad Intern., Inc. v. Doe*, 2013 WL 178141, *2 (E.D. Cal. Jan. 16, 2013). That is shown "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276

response (doc. 8), the Court will review Rule 20(a)(2)'s criteria, as set

forth in another BitTorrent case:

> A plaintiff may join two or more defendants in a single action under Federal Rule of Civil Procedure 20 if two independent requirements are satisfied: (1) the claims against the defendants must be asserted "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," *and* (2) there must be a "question of law or fact common to all defendants." *See* Fed. R. Civ. P. 20(a)(2). The purpose of the rule is "to promote trial convenience and to expedite the resolution of disputes, thereby preventing multiple lawsuits," 7 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE &

---

(N.D. Cal. 2002); *see also Thompsons Film, LLC v. Doe 119*, 2013 WL 1787807 at * 1-2 (M.D. Fla. Apr. 26, 2013) (Apr. 26, 2013) (early discovery factors in a BitTorrent case); *Canal Street Films v. Does 1-22*, 2013 WL 1775063 at * 4 (M.D. Pa. Apr. 25, 2013) (granting early discovery subject to enumerated protective conditions).

In authorizing early discovery in a similar case, the *Quad Intern* court applied a multi-part test, paraphrased here, requiring BitTorrent-victimized plaintiffs like Voltage to: (1) identify each Doe defendant with enough specificity to enable the Court to determine that the defendant is a real person or entity who would be subject to the Court's jurisdiction and thus Fed. R. Civ. P. 17 status; (2) describe all prior steps taken to identify the Doe defendant in a good faith effort to locate and serve him or her; (3) state a copyright infringement claim by pleading ownership of a valid copyright violated by the defendant, 17 U.S.C. § 501(a); (4) allege personal jurisdiction; (5) allege venue, which can be "in any judicial district in which the defendant would be amenable to personal jurisdiction if the district were a separate state," *Quad Intern*, 2013 WL 178141 at * 5; (6) show a reasonable likelihood of ultimately being able to identify the defendant(s); and (7) show that the Cable Privacy Act (47 U.S.C. § 551) will not be violated. The movant met all of those requirements in *Quad Intern*, so the Court granted its request for early, expedited discovery and subpoenas, subject to conditions. *Id.* at * 6.

Because the Court finds that test to be useful and prudent, it will be applied here. Voltage's complaint satisfies all of the above criteria except the last (Cable Privacy Act) requirement. *See* doc. 1 at 1-16. But it seems likely that Voltage can meet the latter (and it is free to amend its complaint), so the Court **GRANTS** its request for pre-answer discovery.

PROCEDURE § 1652. "[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 16 L.Ed.2d 218 (1966). Although "transaction or occurrence" is not defined in Rule 20(a), courts interpret the term as "comprehend[ing] a series of many occurrences, depending not so much upon the immediateness of their connection as upon their *logical relationship.*" *Lozada v. City of Chicago, No. 10 C 1019*, 2010 WL 3487952 at *2 (N.D. Ill. Aug. 30, 2010) (Aspen, J.) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) ("[A]ll 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence.")); *see also Dean v. City of Chicago*, No. 09 C 1190, 2009 WL 2848865, at *2 (N.D. Ill. Aug.31, 2009) (Kennelly, J.) (also citing Mosley ).

*Reynolds*, 2013 WL 870618 at *8 (emphasis added). The flexibility of the logical relationship test, which is also employed under Fed. R. Civ. P. 13(a), "enables the federal courts to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding under the provisions of Rule 20." 7 FED. PRAC. & PROC. § 1652 at 410. Nevertheless, "courts maintain broad discretion concerning whether to permit joinder and may sever defendants based on an evaluation of whether joinder would comport with the principles of fundamental fairness, prejudice either side, or confuse and complicate the issues for the parties involved." *John Wiley & Sons, Inc. v. John Doe Nos. 1-22*, 2013 WL 1091315 at * 1 (S.D.N.Y.

Mar. 15, 2013) (quotes and cite omitted).

Voltage argues that the logical relationship test trumps this Court's temporality concerns (that too much time had elapsed between each defendant's download, strongly suggesting no Rule 20 "transaction"[9] between them), and it cites cases like *Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332 (D.D.C. 2011), in arguing, for example, that joinder *benefits* BitTorrent defendants by, *inter alia*, enabling them to see each other's defenses. Doc. 8-1 at 13. *Call of the Wild* authorized joinder in part because the film-copyright owner' claims against the Doe defendants there potentially stemmed from the same transaction or occurrence and, that court concluded, were logically related. The owners alleged that in each case the defendants used BitTorrent to illegally distribute copyrighted films, and (mistakenly) explained that BitTorrent made every downloader defendant an uploader of illegally transferred

---

[9] Importantly, showing that claims arise under the same general law does not necessarily establish a common question of law or fact. *Patrick Collins, Inc. v. John Does 1 through 34*, 2013 WL 1660673 at * 2 (S.D. Cal. Apr. 16, 2013). And even if Rule 20(a)'s requirements are met, "a district court must examine whether permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to either side." *Id.* (quotes and cite omitted). Hence, Rule 20 also authorizes the Court to sever defendants "(1) to prevent jury confusion and judicial inefficiency, and (2) to prevent unfair prejudice to the defendants." *Id.* (quotes, cite and alteration omitted).

files.[10]  Since each putative defendant was the *possible* source for the movies, he could be responsible for distributing movies to other putative defendants using same file-sharing protocol (BitTorrent).  *Call of the Wild*, 770 F. Supp. 2d at 343.

That case, and others like it,[11] fundamentally misunderstand BitTorrent.  BitTorrent is a *protocol*.  It is not a single file-sharing network, but a system of rules enabling the distribution of files over the internet.  While defendants may have downloaded and shared the same copyright-protected file, their common use of the BitTorrent protocol no more establishes a common enterprise than saying, more broadly, that someone obtained the file using the Internet Protocol or the File Transfer Protocol and thus should be lumped into a single suit along with every other person who obtained the file using the same method.

---

[10] As discussed in text above, not every downloader is automatically an uploader.

[11] *See Patrick Collins, Inc. v. John Does 1–21*, 282 F.R.D. 161, 168–169 (E.D. Mich. 2012) ("the law of joinder does not have as a precondition that there be temporal distance or temporal overlap; it is enough that the alleged BitTorrent infringers participated in the same series of uploads and downloads in the same swarm. . . ."); *First Videos, LLC v. Does 1–76*, 276 F.R.D. 254, 257 (N.D. Ill. 2011) (the fact that "the downloading is alleged to have taken place over the space of more than a month . . . do[es] not make joinder inappropriate" considering "[t]he nature of the BitTorrent distribution protocol necessitates a concerted action by many people in order to disseminate files...."); *see also Reynolds*, 2013 WL 870618 at * 9 (collecting cases).

Much of the confusion seems to center around the mechanics of BitTorrent swarms. It is a common misconception that for a specific film, for instance, there is *a* swarm. It is more accurate to think of BitTorrent as providing several distinct swarms -- a swarm of swarms -- both simultaneously and temporally, rather than as a series of interconnected and interdependent transactions.

Just because each user has the same file with the same digital fingerprint (info hash), it is not necessarily true that they participated in a single swarm. There are hundreds of BitTorrent trackers, and they each maintain their own set of peers for any specific file.[12] While some torrent files contain information for connecting multiple trackers,[13] "[t]o avoid overloading trackers, the BitTorrent protocol only allows a peer to associate with one tracker per file that it is downloading (unless the tracker is no longer available and a new tracker must be contacted)."[14]

---

[12] It is worth noting that a BitTorrent user may create multiple torrent files that link to the *exact same* underlying data, but are addressed to a different tracker. *See* How to Cross-Seed Torrents, Torrent-Invites.com, *available at* http://www.torrent-invites.com/bittorrent/72915-how-cross-seed-torrents.html (last visited May 8, 2013).

[13] Admittedly there is likely *some* overlap, thanks to peer exchange and distributed hash tables; both are tools that enable torrenters to learn of other seeders who were not reported by a tracker. Di Wu, et al., *Understanding Peer Exchange in BitTorrent Systems* (2008), http://www.cis.poly.edu/~ross/papers/PEXIEEEp2p.pdf.

[14] While multi-tracker torrents exist, they only provide redundancy when a single

György Dán and Niklas Carlsson, *Dynamic Swarm Management for Improved BitTorrent Performance* (2009), http://static.usenix.org/event/iptps09/tech/full_papers/dan/dan.pdf (footnotes added). In any event, multi-tracker systems actually contribute to the multiple-swarm phenomenon. Abeer Hamdy and Ratan Guha, *A Characterization of Bit Torrent Systems Based on Performance and Features* (2011), http://www.iiis.org/CDs2011/CD2011IMC/IMCIC_2011/PapersPdf/ZA618 NN.pdf. In other words, the BitTorrent protocol allows many paths to the same underlying data, which leads to multiple swarms and sub-swarms (as a tracker only gives access to a limited number of peers in its total peer list) rather than through a single vector. Additionally, the swarms are constantly evolving, with new leechers joining while old seeders quit. A typical home internet user can download a 5GB movie (about the size of a DVD), in less than half-an-hour at common cable internet speeds. Unless the person has continued to seed long after the initial download, they would presumably exit their respective swarm soon after their download completed. When they leave, someone else

tracker fails. "One disadvantage to this is that it becomes possible to have multiple unconnected swarms for a single torrent where some users can connect to one specific tracker while being unable to connect to another." BitTorrent Tracker, Wikipedia, https://en.wikipedia.org/wiki/BitTorrent_tracker#Multi-tracker_torrents.

may take their place, or the swarm may slowly disintegrate. The composition of a swarm is in a constant state of flux.[15]

Voltage makes much of the fact that all of the users have shared *the exact same file*, which some person presumably ripped and shared online. (Doc. 8-1 at 3.) In that regard, they reason that all of the transfers *are* related, since there is a chain of transactions dating back to the original infringer. This is a common refrain, since "[t]he only nonconjectural link between Defendants who access a swarm at different

---

[15] Notably, plaintiff has not alleged that its investigator obtained chunks of the movie from a single torrent tracker, using a single torrent file in a short time window. (Doc. 1 at 12.) Instead, Voltage says that "[w]hile the logical relationship test does not require it, should this matter go to trial, Plaintiff will prove that the Defendants' infringement was committed through the same transaction or through a series of transactions with mathematical certainty by demonstrating, *inter alia*, that the algorithm used by BitTorrent Trackers would have caused the entire series of transactions to be different but for each of the Defendants' infringements. These transactions must be considered logically related, because the absence of any one of the Doe Defendants from the swarm would have changed the transactions." Doc. 8-1 at 5 (footnote added).

It's not clear what that means. Does Voltage mean to say that the defendants' alleged movie pirating could not have occurred *but for each* defendant's participation, and thus they operated in concert with each other, even if Voltage's own "participation list" (doc. 1-1) shows that they did so over a matter of *months?* Is it claiming that if any one of the defendants dropped out the "swarm transaction" (the downloading of Voltage's film), the rest of the 31 downloads would not have occurred? Has it pled facts showing that each Doe defendant was technologically connected, in one Rule 20 transaction, so that each may be said to have contributed to one if not all of the other's movie pirating, and thus each handed off some if not all of Voltage's film to the others, or at least facilitated that result? A review of its complaint shows that the answer is no, it has not made such allegations. Plaintiff alleges only that each Doe joined a swarm, downloaded plaintiff's film, then made it "available" for others to pirate.

times is their mutual reliance on the Initial Seeder's upload of the file."

*Reynolds*, 2013 WL 870618 at * 12. The reasoning is unworkable. It could lead to the joinder of hundreds or thousands of people using *any* means of transmission over a period of *years*, despite their own involvement being inconsequential to the piracy swarm in general, and regardless of the fact that they likely never directly transacted the file to anyone else named in the complaint.[16]

A hypothetical offers some perspective here. Say someone purchased a CD and then distributed copies to thousands of people all over the world. Those people then copied the CD and handed it to more people, and this process continues for years. Should every person within a specific court's jurisdiction be joined into a single lawsuit simply because the CD they've obtained illegally contains the same information encoded on the initial infringer's disc? While there is a logical relationship in a broad sense, it goes too far to permit joinder, for the copyright infringers will likely have distinct defenses, there is a

---

[16] The Court similarly rejects plaintiff's assertion that the infringers are connected through their sharing of the file with the investigator. (Doc. 8-1 at 6.) After all, the sharing took place over some months, and it is unclear whether all of the sharing happened in a single swarm, despite plaintiff's evidentially unsupported assertion that it did.

substantial temporal separation, and it seems unlikely that there will actually be much in the way of factual overlap between the defendants, except in the sense that they ultimately received the same data. Instead of viewing this as a series of transactions, the Court sees it as thousands of discrete transactions making use of the same technology (in the hypothetical, a CD burner). In much the same way, the Doe defendants here most likely did "not rely on each other, nor d[id] they necessarily pave the way for later participants to obtain the file. For example, had Doe 15 never entered the swarm . . . , the remaining Does would still have been able to download the Works as alleged so long as someone possessing the Initial Seed or a complete copy remained in the swarm." *Reynolds*, 2013 WL 870618 at * 12.

As such, the Court favors the more restrictive view to joinder. *See Liberty Media Holdings, LLC v. BitTorrent Swarm*, 277 F.R.D. 669, 671– 72 (S.D. Fla. 2011) (finding joinder improper after "[a] close examination of Defendants' activity reveal[ed] that Defendants, subject to one exception, used BitTorrent on different days and at different times over a two-month period," explaining that "[m]erely participating in a BitTorrent swarm does not equate to participating in the same

'transaction, occurrence, or series of transactions or occurrences'").
Courts should demand more because otherwise any "swarmer" can be
joined in *any* BitTorrent lawsuit so long as it is shown that he
downloaded part or all of a copyrighted film using the protocol, no matter
how much time has elapsed between his entrance into and exit from the
swarm, and despite the absence of an *actual* transmission of an offending
file between, for example, Doe 1's computer and Doe 2's. "The mere
capability of a defendant to upload to other defendants after his or her
hit date by leaving the Client Program running is insufficient to support
the assumption that such transactions are related. *See, e.g., Hard Drive
Productions [Inc. v. Does 1-188*, 809 F. Supp. 2d 1150, 1164–65 (N.D.
Cal. 2011)] (denying joinder and rejecting plaintiff's argument that Doe
defendants' use of the same BitTorrent swarm makes each defendant a
'possible' source that 'may' be responsible for distributing the
copyrighted file to the other defendants)." *Reynolds*, 2013 WL 870618 at
*13 (emphasis added). Just as federal lawsuits should not proceed on
sheer speculation, neither should defendants be joined and tried together
on that basis:

> Without a showing that the Doe defendants *actually exchanged
> pieces of the Works with one another, relied on each others'*

*activity, or otherwise paved the way for each others' success in the swarm*, all that is alleged is that the Defendants went to the same place at different times to engage in the same unlawful activity. While the law of joinder does not necessarily require *temporal overlap* or specific knowledge of other defendants, it does require more than mere allegations that two or more unrelated defendants stole the same product in the same way without ever interacting with one another.

*Reynolds*, 2013 WL 870618 at * 13 (emphasis added). "[M]ere allegations that two or more unrelated defendants stole the same product in the same way without ever interacting with one another" is the *essence* of speculation, not a factual basis for joinder.[17] *Id.*

And under the relaxed approach things can quickly degenerate: "defendants in these types of cases assert a variety of individualized defenses, one of which will often be the 'it wasn't me' defense. *Malibu Media*, 2013 WL 525352 at *4. These defenses can involve an unquantifiable number of different factual scenarios that each would require independent discovery and adjudication." *Third Degree*, 2013

---

[17]  Such speculation is not a foundation on which a federal lawsuit should be perched, and it is especially significant here, in an abuse-prone area of litigation. *See, e.g.*, *Night of the Templar, LLC v. Does 1-25*, 2013 WL 1500454 at * 2 (N.D. Ohio Apr. 10, 2013) ("The [early discovery] requests have been the subject of much criticism, for the lawsuits are rarely litigated. Rather, plaintiffs often seek to take advantage of the resources of federal courts to force small, individual settlements."); *see also id.* (collecting cases); *Third Degree*, 2013 WL 1164024 at * 10 (warning about misuse of Rule 20(a) in this context).

WL 1164024 at * 6 (quotes, footnote and cite omitted). "The prospect of individualized defenses is but one of many logistical and administrative complications that joinder of plaintiff's claims would create, transforming what appears to be a relatively straightforward case . . . into a cumbersome procedural albatross. *Id.* at * 8 (quotes and cite omitted); *see also id.* ("Plaintiff provides no indication as to how it will go about organizing the case management conference.").

Voltage therefore must allege that each defendant: (a) participated in a common swarm at the same time as each other defendant; and (b) *actually* exchanged a piece of the copyrighted material with another. Because "[w]here a swarm continues to exist for an extended period of time, it is improbable that defendants entering a swarm weeks or months apart will actually exchange pieces of data. Furthermore, it is impossible for defendants who are not in a swarm coextensively to exchange any pieces of a file." *Reynolds*, 2013 WL 870618 at *11.

The Court is not suggesting that Voltage has failed to allege enough here to sue each Doe for infringement, it is just deciding that they may not join all of these defendants together in a single lawsuit. Voltage has the right to defend its copyright. So even though the Court is applying

the more restrictive approach to sever all but one John Doe defendant,
nothing prevents Voltage from pleading the elements necessary to meet
the more restricted approach illuminated above. And nothing here
prevents Voltage from filing lawsuits against any of the remaining
defendants. The issue at this stage, for that matter, is less about access
to the courts but simply economics -- the fee costs to Voltage and fee
losses to the public, a subset of which is deterrence: A $350 filing fee, the
Court previously noted, acts as a modest deterrent to sloppiness in
selecting defendants. *See Voltage*, 2013 WL 1339724 at *3; *Night of the
Templar*, 2013 WL 1500454 at *3; *Third Degree*, 2013 WL 1164024 at * 8
("Individual suits would also ensure that the salutary purposes of the
statutorily mandated filing fee --including the modest threshold barrier it
provides against the filing of baseless claims -- are preserved.").

Finally, nothing prevents Voltage from exercising third party
discovery rights, or from later seeking consolidation under Fed. R. Civ. P.
42. *See Patrick Collins*, 2013 WL 1660673 at * 4; *Third Degree*, 2013
WL 1164024 at * 9 ("Should the individual suits against these defendants
develop such that fairness and efficiency would be better served by
joining them in whole or part, consolidation remains an option at that

time.").

## III. CONCLUSION

Plaintiff Voltage Pictures, LLC's motion for early discovery (doc. 4) is **GRANTED** in part and **DENIED** in part.  The Court severs all defendants save one, which Voltage is free to select by amending its complaint (where it should also show whether it meets the Cable Privacy Act's protections).  Voltage may serve that defendant's ISP provider with a subpoena to elicit the defendant's name and address. Voltage shall serve a copy of this Order upon any subpoenaed ISP provider as well as the defendant.

**SO ORDERED** this __20th__ day of May, 2013.


UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA